Kevin W. Weber, Esq.
Jessica L. Guarracino, Esq.
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
Telephone: (973) 596-4500
Facsimile: (973) 596-0545
kweber@gibbonslaw.com
jguarracino@gibbonslaw.com
*Attorneys for Defendant/Counterclaim Plaintiff*
*Human Interest Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| COLONIAL SURETY COMPANY, | Civil Action No. 25-cv-16897 |
| *Plaintiff/Counterclaim Defendant*, | **DEFENDANT HUMAN INTEREST'S ANSWER AND AFFIRMATIVE DEFENSES TO THE COMPLAINT, COUNTERCLAIMS, AND JURY DEMAND** |
| v. | *Document Electronically Filed* |
| HUMAN INTEREST, INCORPORATED, | |
| *Defendant/Counterclaim Plaintiff*. | *Previously pending in the Superior Court of New Jersey, Bergen County, Docket No. BER-L-6565-25* |

Defendant Human Interest Inc. ("Human Interest"), by way of Answer to the Complaint for Declaratory Judgment ("Complaint") of Colonial Surety Company ("Colonial") states as follows:

### JURISDICTION AND VENUE

1.     The allegations contained in this paragraph constitute legal conclusions to which no response is required, and Human Interest leaves Colonial to its proofs thereon.  To the extent a response is required, Human Interest admits only that the Superior Court of New Jersey, Bergen

County, Law Division could exercise original jurisdiction in this matter. Human Interest denies any implication that the action may not have been brought in any other court.

2.     The allegations contained in this paragraph constitute legal conclusions to which no response is required, and Human Interest leaves Colonial to its proofs thereon. To the extent a response is required, Human Interest admits only that the Superior Court of New Jersey, Bergen County, Law Division could be a proper venue. Human Interest denies any implication that the action may not have been brought in any other venue.

## PARTIES

3.     Human Interest is without sufficient information to form a belief as to the truth or falsity of the allegations contained in this paragraph, and leaves Colonial to its proofs thereon.

4.     Human Interest is without sufficient information to form a belief as to the truth or falsity of the allegations contained in this paragraph, and leaves Colonial to its proofs thereon.

5.     Admitted.

6.     Admitted.

7.     Admitted.

## FACTUAL ALLEGATIONS

8.     Admitted that Colonial issues fidelity bonds ("ERISA Bonds"). Otherwise, Human Interest is without sufficient information to form a belief as to the truth or falsity of the allegations concerning the entities to whom Colonial issues its fidelity bonds, as referenced in this paragraph, and leaves Colonial to its proofs thereon.

9.     The allegations contained in this paragraph constitute legal conclusions to which no response is required, and Human Interest leaves Colonial to its proofs thereon. To the extent a response is required, denied.

10.     The allegations contained in this paragraph constitute legal conclusions to which no response is required, and Human Interest leaves Colonial to its proofs thereon.  To the extent a response is required, denied.

11.     Admitted that Human Interest provides 401(k) services.  Otherwise, Human Interest is without sufficient information to form a belief as to the truth or falsity of the allegations concerning the meaning of the phrase "Colonial insureds," and leaves Colonial to its proofs thereon.

12.     Human Interest is without sufficient information to form a belief as to the truth or falsity of the allegations contained in this paragraph, and leaves Colonial to its proofs thereon.  The allegations contained in this paragraph refer to and seemingly quote from the contents of a document that is not attached to the Complaint.  To the extent that document exists, it speaks for itself.

13.     Admitted that Human Interest sought unpaid premium refunds from Colonial on January 23, 2025.  Otherwise, denied as stated.

14.     Admitted that Human Interest is owed certain commissions from Colonial.  Otherwise, denied as stated.

15.     Human Interest is without sufficient information to form a belief as to the truth or falsity of the allegations contained in this paragraph, and leaves Colonial to its proofs thereon.

16.     The allegations contained in this paragraph constitute legal conclusions to which no response is required, and Human Interest leaves Colonial to its proofs thereon.  To the extent a response is required, denied.

17.     Denied.

18.     The allegations contained in this paragraph constitute legal conclusions to which no response is required, and Human Interest leaves Colonial to its proofs thereon.  To the extent a response is required, denied.

### First Cause of Action
### (Declaratory Judgment Pursuant to N.J.S.A. 2A:15-53)

19.     Human Interest repeats and realleges each of its responses to the above paragraphs of the Complaint as though fully stated herein.

20.     The allegations contained in this paragraph constitute legal conclusions to which no response is required, and Human Interest leaves Colonial to its proofs thereon.  To the extent a response is required, denied.

21.     The allegations contained in this paragraph constitute legal conclusions to which no response is required, and Human Interest leaves Colonial to its proofs thereon.  To the extent a response is required, denied.

22.     The allegations contained in this paragraph constitute legal conclusions to which no response is required, and Human Interest leaves Colonial to its proofs thereon.  To the extent a response is required, denied.

23.     Admitted that Colonial issues ERISA Bonds.  Otherwise, Human Interest is without sufficient information to form a belief as to the truth or falsity of the allegations concerning the entities to whom Colonial issues its fidelity bonds, as referenced in this paragraph, and leaves Colonial to its proofs thereon.

24.     Human Interest is without sufficient information to form a belief as to the truth or falsity of the allegations contained in this paragraph, and leaves Colonial to its proofs thereon.  The allegations contained in this paragraph refer to and seemingly quote from the contents of a

document that is not attached to the Complaint.  To the extent that document exists, it speaks for itself.

25.     The allegations contained in this paragraph constitute legal conclusions to which no response is required, and Human Interest leaves Colonial to its proofs thereon.  To the extent a response is required, denied.

26.     The allegations contained in this paragraph constitute legal conclusions to which no response is required, and Human Interest leaves Colonial to its proofs thereon.  To the extent a response is required, denied.

## DEMAND FOR RELIEF

**WHEREFORE**, Human Interest respectfully requests that the Court enter judgment in its favor on all claims set forth in Colonial's Complaint against Human Interest, awarding Colonial nothing on its causes of action against Human Interest, denying any request for declaratory judgment, dismissing the Complaint against Human Interest with prejudice and on the merits, and awarding Human Interest all of the costs, disbursements, and reasonable attorneys' fees Human Interest incurs in connection with this action, and such other relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Human Interest hereby demands a trial by jury on all issues triable to a jury.

## AFFIRMATIVE DEFENSES

Without assuming the burden of proof with respect to any matter for which Colonial bears such burden, Human Interest asserts the following separate affirmative defenses to the claims set forth in the Complaint:

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of waiver.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by its own conduct, including but not limited to its failure to comply with its own contractual obligations and/or its breach of the implied covenant of good faith and fair dealing.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrines of laches, unclean hands, and/or estoppel.

## FIFTH AFFIRMATIVE DEFENSE

At all relevant times, Human Interest has complied with all applicable laws, rules, regulations, codes, and standards.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff would be unjustly enriched if they were allowed to recover all of the damages alleged in the Complaint.

## SEVENTH AFFIRMATIVE DEFENSE

Human Interest has a defense founded upon documentary evidence.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by a failure of consideration.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff lacks standing to assert the claims asserted in the Complaint.

### TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of accord and satisfaction.

### ELEVENTH AFFIRMATIVE DEFENSE

Any loss or damage allegedly sustained by Plaintiff was occasioned by the acts or omissions of Plaintiff.

### TWELFTH AFFIRMATIVE DEFENSE

Human Interest is not a party to the ERISA bonds identified in the Complaint.

### THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrines of ratification, and/or acquiescence.

### FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because they constitute an impermissible preemptive strike against Human Interest's imminent claims and an effort to preemptively adjudicate defenses to anticipated litigation.

### FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff has not suffered any damage or injury as a result of Human Interest's conduct.

### SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitation(s).

### SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to mitigate its injuries and/or damages.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff seeks an impermissible advisory opinion, which is not appropriately justiciable.

## NINETEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because they seek to circumvent Defendant's right to a jury trial.

## RESERVATION OF RIGHT TO ASSERT ADDITIONAL DEFENSES

Human Interest reserves the right to assert and rely upon additional affirmative defenses that become available or apparent through discovery, development of the case, or otherwise. Human Interest expressly reserves the right to amend its Answer to the Complaint to assert all such affirmative defenses.

## COUNTERCLAIMS

Human Interest Inc. ("Human Interest"), for its Counterclaims against Defendant Colonial Surety Company ("Colonial"), states and alleges as follows:

## PARTIES

1.      Human Interest is a corporation organized under the laws of the State of Delaware with its principal place of business at 655 Montgomery Street, Suite 1800, San Francisco, California.

2.      Human Interest was formerly known as "Captain401 Inc." and, pursuant to a Certificate of Amendment of the Amended and Restated Certificate of Incorporation, effected a name change to "Human Interest Inc." by filing the same with the Office of the Secretary of State of the State of Delaware on February 5, 2018.

3.    Human Interest, on February 7, 2018, filed with the Secretary of State for the State of California an Amended Statement by Foreign Corporation (Name Change ONLY), setting forth its name change from "Captain401 Inc." to "Human Interest Inc."

4.    Upon information and belief, Colonial is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business at 123 Tice Boulevard, Suite 250, Woodcliff Lake, New Jersey.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount-in-controversy exceeds $75,000.00 and complete diversity of the parties exists, as follows:

a.    Human Interest is a citizen of Delaware, the state in which it is incorporated, and California, the state in which it has its principal place of business; and

b.    Defendant Colonial is a citizen of Pennsylvania, the state in which it is incorporated, and New Jersey, the state in which it has its principal place of business.

6.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Colonial is a resident of the State of New Jersey and resides in this district. Further, venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Human Interest's counterclaims occurred in this district.

7.    This Court has supplemental jurisdiction over these Counterclaims pursuant to 28 U.S.C. § 1367 because the facts underlying Human Interest's counterclaims are so related to the claims in Colonial's complaint that they form part of the same case or controversy.

## BACKGROUND

8.    Human Interest provides 401(k) and related administrative services to small- and medium-business employers that sponsor employee retirement plans. Human Interest provides

both fiduciary and non-fiduciary services to plans and plan sponsors, such that it is required to comply, and to ensure that its services and the plans with which it works are in compliance, with the Employee Retirement Income Security Act ("ERISA") and Department of Labor ("DOL") regulations issued thereunder, including those applicable to ERISA 3(16) fiduciaries.  A core aspect of Human Interest's services to its clients is ensuring that plan assets are adequately secured with appropriate insurance and bonding.

9.      Colonial is a provider of ERISA fidelity bonds, among other products and insurance pertinent to employee benefit plans, 401(k) plans, and other retirement plans.

10.     During the relevant period, Human Interest obtained from Colonial ERISA fidelity bonds for its customers, the retirement plan sponsors, in exchange for the up-front payment of premiums.  The parties agreed that Human Interest would be entitled to a pro-rata premium refund for any ERISA bonds that were canceled, transferred, or otherwise terminated at any time on or before the mid-term anniversary of the bond term (typically on or before the 6-month or 18-month anniversary of the respective bond).  Further, the parties also agreed that, if Human Interest introduced or referred its clients to Colonial for certain services, Colonial would pay to Human Interest a 5% or 10% commission calculated based on the first-year premium paid by the referred client.

11.     During the relevant period, Human Interest purchased thousands of ERISA fidelity bonds from Colonial for its customers and, for various reasons, certain of those bonds were terminated on or before the mid-term anniversary, entitling Human Interest to receive a partial premium refund from Colonial.  Colonial also erroneously charged, and Human Interest paid, for numerous bonds for certain customers that were duplicative and unnecessary.  Similarly, Human Interest introduced and referred numerous clients to Colonial, earning commissions.

12.     Colonial agreed to pay earned commissions, to issue partial refunds for early-terminated bonds, and to provide full refunds for certain duplicative bonds that were erroneously issued.  Colonial also agreed to provide a certain level of service, to maintain Human Interest's client information in confidence, and to refrain from using the confidential business information to directly solicit Human Interest's clients to renew their bonds.

13.     Colonial failed to honor the parties' agreements, including by failing to pay to Human Interest earned commissions, failing to issue partial refunds for early-terminated bonds, and failing to provide full refunds for certain duplicative bonds that were erroneously issued.

14.     In 2024, due to ongoing and unresolved issues with Colonial's service, Human Interest began exploring options to consolidate various aspects of its insurance programs, including seeking out options to obtain all of its insurance and ERISA bonding through a single provider. Human Interest ultimately determined that it was in the best interest of itself and its clients to transfer its ERISA bonding away from Colonial and to a new provider.

15.     Colonial was notified of Human Interest's determination and, almost immediately, began to ignore Human Interest's communications and failed to provide service.

16.     After Human Interest informed Colonial of its intent to transfer its ERISA bond services to another provider and expressly advised Colonial not to renew any ERISA bonds related to Human Interest's plan and plan sponsor clients, Colonial improperly used Human Interest's confidential business information to directly contact Human Interest's clients to solicit unnecessary ERISA bond renewals.  This created confusion, uncertainty, and distrust among Human Interest's clients regarding their ERISA bond status and the security of the underlying plan assets—matters for which Human Interest has both fiduciary and non-fiduciary obligations.

17.    As a result of Colonial's conduct in breach of its agreements and ongoing failure to provide adequate service and perform under the BCPA, Human Interest will likely need to move its existing bonds from Colonial to a different provider, instead of letting the bonds extend through their terms and expire.  Because Human Interest has already paid Colonial up-front premiums for these bonds, it will incur costs of more than $1,700,000 to migrate the bonds.

18.    As a result of Colonial's conduct in breach of its agreements, Human Interest has been and will be damaged more than $2,100,000, representing, among other damages, unpaid commissions, unreturned partial or full premiums, and attorneys' fees. Further, Human Interest has also been injured as a result of Colonial's tortious conduct and interference with Human Interest's clients and Colonial's repeated failures to deliver contractually required services.

## FACTUAL ALLEGATIONS

19.    On or about November 24, 2015, Human Interest, then acting under its prior name "Captain401 Inc.," and Colonial entered into a Bond Compliance Program Agreement ("BCPA"). A copy of the BCPA is attached to this Counterclaim as Exhibit 1.

20.    The ultimate goal of the BCPA was for Colonial to "make it easy" for Human Interest and its clients to secure and maintain ERISA bonding that is approved by the U.S. Department of Labor ("DOL") and in compliance with ERISA.

21.    Colonial consistently disregarded and undermined that goal, repeatedly acted in ways contrary to the BCPA and the parties' express agreements, and eroded the trust and expectations fundamental to their business relationship.

### Premium Refunds

22.    Human Interest acts as a fiduciary to its clients and, as part of its fiduciary responsibilities, advises them on the procurement of ERISA fidelity bonds.

23.     Human Interest would obtain for its clients either one-year or three-year bonds directly from Colonial and would pay the full cost of each bond upfront for its entire term.

24.     Colonial would then issue the bond in the client's name.  Human Interest is not a party to the bond between Colonial and the insured.

25.     In or around February 2021, Colonial and Human Interest agreed that Colonial would provide Human Interest with a prorated refund of the premium paid for any bond that was terminated prior to the policy's mid-term point.  A copy of the agreement is attached to this Counterclaim as Exhibit 2.

26.     Under the agreement, Human Interest would provide Colonial with a list of clients whose bonds are to be terminated, and Colonial would ensure the appropriate refunds were issued to Human Interest.

27.     Pursuant to the agreement, Colonial did in fact on multiple occasions provide prorated refunds of premiums paid by Human Interest for one-year and three-year bonds that terminated halfway through the bond term.

28.     However, despite the parties' clear agreement and established course of dealing, Human Interest has not received a significant amount of premium refunds from Colonial.  A copy of an exchange confirming the course of dealing is attached to this Counterclaim as Exhibit 3.

29.     Human Interest also paid Colonial for numerous duplicative bonds that Colonial erroneously issued for the same customers, and Colonial has not reimbursed Human Interest for these duplicative bond premiums.

30.     Upon information and belief, Colonial's failure to issue the required refunds and reimbursements to Human Interest was caused, at least in part, by Colonial's inadequate customer service and poor recordkeeping—issues that persisted throughout the parties' relationship.

## Colonial's Breach of Service Obligations

31.     In addition to the conduct already described, the parties' relationship has been materially and adversely affected by Colonial's repeated failures to deliver adequate service and meet the standards outlined in the BCPA.

32.     Pursuant to the "Services Provided by Colonial Surety" section of the BCPA, Colonial is required to assist Human Interest "in the orderly transition of bond replacement coverage for each plan listed on the bond management reports."

33.     Colonial is further required to "provide the services of its account representatives to ensure a smooth transition and assist with the management of the renewal process."

34.     Additionally, Colonial must "monitor and handle all future bond renewals to ensure continuous plan sponsor ERISA bond compliance."

35.     Colonial has failed to fulfill these contractual obligations.

36.     Throughout the course of the parties' relationship, Colonial has demonstrated a consistent lack of responsiveness to communications.

37.     Colonial has also failed to maintain adequate records.

38.     Colonial neglected to renew policies in a timely manner, resulting in lapses in coverage that required Human Interest to obtain retroactive coverage.

39.     Colonial only became aware of these lapses after Human Interest identified and raised the issue.

40.     At times, when Human Interest raised concerns with the level of service provided by Colonial, Colonial would ignore the communications or outright refuse to take corrective action.

41.     As a result of Colonial's actions, including but not limited to its inadequate service, on November 4, 2024, Human Interest informed Colonial that it had transitioned to a new bond provider and explicitly instructed Colonial not to renew any existing bonds.

42.     Following this notice, Colonial discontinued nearly all communications with Human Interest and largely ceased responding to Human Interest's inquiries altogether.

<u>Commission ("ATR") Payments</u>

43.     Colonial has also failed to issue commission payments owed to Human Interest under the terms of the parties' agreement.

44.     Under the BCPA, Human Interest and Colonial entered into a commission agreement where Colonial was obligated to pay Human Interest an Advertising Transaction Revenue ("ATR").

45.     With respect to bonds issued by Colonial to or for retirement plans introduced by Human Interest to Colonial, Colonial was required to pay ATR to Human Interest in the amount of 10% of the first year premium received by Colonial for the bond.

46.     With respect to policies of insurance issued by Colonial to or for retirement plan sponsors introduced by Human Interest to Colonial, Colonial was required to pay ATR to Human Interest in the amount of 5% for the first year premium received by Colonial for the Policy of Insurance.

47.     Colonial was obligated to pay Human Interest ATR pursuant to the BCPA, and the parties' course of performance, through on or about February 26, 2021, at which time Human Interest voluntarily terminated the ATR.

48.     However, Colonial has failed to pay Human Interest all ATR to which it is entitled.

## Misuse of Human Interest's Confidential Business Information

49. Colonial has also been directly contacting Human Interest's clients regarding bond renewals by misuse of Human Interest's confidential business information, in violation of the parties' agreements.

50. Pursuant to the BCPA's confidentiality provision, Colonial expressly agreed that the information provided by Human Interest to Colonial was "only for the purposes of ***assisting [Human Interest]*** in verifying DOL compliance and providing clients with the opportunity to secure ERISA-related bonds and insurance from Colonial, and that none of [Human Interest's] client information would be shared with third parties."

51. The BCPA confidentiality provision further states, in no uncertain terms: "Neither of the parties to this Agreement shall disclose to any third person or entity any of the information that party received pursuant to this Agreement."

52. The only stated exception to this confidentiality provision is that either party may disclose to a client of Human Interest or an insured of Colonial the fact that it provided information to, or received information from, the other party to the BCPA regarding the client or insured, and the terms of the BCPA itself.

53. Under the express terms of the BCPA, at all times the plans and plan sponsors, i.e., the clients, remained Human Interest's clients.

54. The client lists and any other information provided to Colonial pursuant to the BCPA was to be used only for the purpose of providing Human Interest and/or its clients with information related to bonds and insurance offered by Colonial.

55. However, under the terms of the BCPA, Colonial could only directly service the plans and/or plan sponsors with Human Interest's consent.

56.    Specifically, the parties agreed under the BCPA: "Colonial will directly service the plan and/or plan sponsors, as directed by [Human Interest]."

57.    The BCPA further limits Colonial's ability to contact Human Interest's clients directly, providing that, only with Human Interest's consent, Colonial may contact Human Interest's clients to gather current expiration dates, to the extent necessary.

58.    On November 4, 2024, Human Interest informed Colonial that it was transitioning to a new bond provider and gave Colonial explicit instructions to not renew any existing bonds.

59.    Despite the terms of the BCPA and Human Interest's clear instructions, Colonial repeatedly contacted—and continues to contact—Human Interest's clients directly to solicit unnecessary bond renewals.

60.    Prior to being notified that Human Interest was transitioning to a new bond provider, Colonial had never reached out directly to Human Interest's clients about bond renewals; Human Interest had exclusively handled those issues.

61.    On June 20, 2025, Human Interest sent two cease and desist emails to Colonial regarding its unauthorized contact of Human Interest's clients.  A copy of these cease and desist emails are attached to this Counterclaim as Exhibits 4 and 5.

62.    Specifically, Human Interest instructed Colonial that Human Interest, as the fiduciary to its clients, is responsible for all bond procurement decisions on their behalf, Human Interest already secured the necessary coverage for its clients through a new provider, Colonial was not authorized to contact Human Interest's clients directly, and any such contact from Colonial created confusion and directly interfered with Human Interest's fiduciary responsibilities.

63.    Human Interest further explained that Colonial's conduct was "not permitted under the express terms of the parties' Agreement, contravenes the parties' course of dealing, violates

Colonial's duty of good faith and fair dealing, constitutes unfair competition and will result in immediate irreparable harm to Human Interest."

64.    Human Interest clearly instructed that "**Colonial must immediately stop all outreach to Human Interest clients regarding bond renewals, effective immediately.**"

65.    Despite being issued two cease and desists, Colonial continued—and continues—to contact Human Interest's clients, employing alarmist language designed to pressure clients into renewing their policies.

66.    These communications included statements such as warnings that clients would be out of compliance and subject to audit or investigation if they failed to renew, some of which took the following form:

> As per my voicemail, I am the account manager here at Colonial Surety Company who will be handling the ERISA Fidelity Bond for [plan name].  The bond that we hold expired [date].  I attached it below for your reference.
>
> The ERISA Fidelity Bond is required by the Department of Labor to protect retirement plan participants from any misuse or mishandling of plan funds. If you do not renew this policy, you will remain **OUT OF COMPLIANCE** with the Department of Labor, and may even trigger an audit and other investigative actions. **If you no longer need this policy, please let me know** so that I can properly close your account with us. If you would like to take advantage of an ongoing promotion to renew your bond at a discounted rate while gaining supplemental coverage for your personal assets, please click on the see offer button once logged in for additional details.
>
> For convenience, to complete your bond renewal and select your coverage package, just follow this link and login: https://quote.colonialsurety.com/.

A copy of one of these emails, with confidential client information redacted, is attached to this Counterclaim as Exhibit 6.

67.    These unsolicited and improper emails caused confusion and concern among Human Interest's clients and financial advisors, who had previously communicated exclusively with Human Interest—the fiduciary—regarding bond procurement and caused irreparable harm.

68.    Colonial's access to the information used in order to directly and improperly solicit Human Interest's clients was solely derived from the BCPA.

69.    Upon information and belief, Colonial has improperly contacted no fewer than 81 of Human Interest's clients directly to solicit bond renewals, and numerous of them have purchased unnecessary bonds from Colonial as a result.

### Transitioning Providers

70.    Human Interest paid the full cost of each bond upfront for its entire term, with the expectation that Colonial would provide consistent, reliable service, comply with the terms of the parties' agreements, and refrain from conduct that would damage the parties' relationship.

71.    The cumulative effect of Colonial's breaches and failures described above has severely frustrated the purpose of the parties' agreement, caused significant disruptions to Human Interest's operations, and seriously undermined the parties' ability to maintain a functional business relationship.

72.    As a direct result of Colonial's actions, Human Interest anticipates that it will likely need to migrate its existing bonds from Colonial to a different provider, rather than allowing them to remain with Colonial through their expiration.

73.    Transitioning the existing bonds to a different provider will require Human Interest to incur substantial costs in excess of $1,700,000.

### Attorneys' Fees

74.    The BCPA contains an Indemnity provision, under which Colonial is required to indemnify Human Interest for reasonable attorneys' fees:

> Colonial indemnifies and holds harmless Captain401 Inc. and its affiliates, officers, directors, employees and agents against any and all loss, claim, damage, liability, penalty, fine or expense (including reasonable attorneys' fees) ("Losses") insofar as such Losses arise out of or are based upon any material breach of this Agreement or any applicable laws by Colonial or any of its representatives, except when the same is due to Captain401 Inc.'s or its affiliate's own misconduct or lack of good faith. This indemnification shall be in addition to any liability which Colonial may otherwise have.

75.     Human Interest is not obligated to provide reciprocal indemnification.

## COUNT I
### (Breach of Contract – Premium Refunds)

76.     Human Interest repeats and realleges each and every allegation set forth above as if fully set forth herein.

77.     Human Interest and Colonial entered into a valid, enforceable, and binding contract, pursuant to which the parties agreed that Colonial would provide Human Interest a prorated refund of the premium paid for any one-year or three-year bond that was terminated prior to the policy's mid-term.

78.     Human Interest performed all actions required by the contract and has fulfilled all of its obligations thereunder.

79.     Colonial breached the agreement by failing to provide Human Interest with the required premium refunds and by failing to refund Human Interest for duplicate bonds.

80.     Colonial's actions constitute a breach of the parties' contract.

81.     As a direct and proximate result of Colonial's breach of contract, Human Interest has suffered damages, including unpaid premium refunds and attorneys' fees, in an amount in excess of $75,000.00, the precise amount to be determined at trial, plus applicable interest and costs.

## COUNT II
**(Breach of Contract – Breach of Service Obligations)**

82.    Human Interest repeats and realleges each and every allegation set forth above as if fully set forth herein.

83.    Human Interest and Colonial entered into a valid, enforceable, and binding contract.

84.    Pursuant to the contract agreement, Colonial agreed to render specific services to Human Interest.

85.    Human Interest performed all actions required by the contract and has fulfilled all of its obligations thereunder.

86.    Colonial breached the agreement by failing to perform the promised services.

87.    Colonial's actions constitute a breach of the parties' contract agreements.

88.    As a direct and proximate result of Colonial's breach of contract, Human Interest has suffered damages, including refunds due, reimbursement of duplicate premium payments, costs to obtain bonds from an alternative provider, and attorneys' fees, in an amount in excess of $75,000.00, the precise amount to be determined at trial, plus applicable interest and costs.

## COUNT III
**(Breach of Contract - Commission ("ATR") Payments)**

89.    Human Interest repeats and realleges each and every allegation set forth above as if fully set forth herein.

90.    Human Interest and Colonial entered into a valid, enforceable, and binding agreement whereby Colonial would pay Human Interest "Advertising Transaction Revenue" through on or about February 26, 2021.

91.    Human Interest performed all actions required by the contract agreements and has fulfilled all of its obligations thereunder.

92.     Colonial breached the agreement by failing to provide Human Interest all Advertising Transaction Revenue required.

93.     Colonial's actions constitute a breach of the parties' contract.

94.     As a direct and proximate result of Colonial's breach of contract, Human Interest has suffered damages, including unpaid Advertising Transaction Revenue and attorneys' fees, in an amount in excess of $75,000.00, the precise amount to be determined at trial, plus applicable interest and costs.

## COUNT IV
### (Breach of Contract – Misuse of Human Interest's Confidential Business Information)

95.     Human Interest repeats and realleges each and every allegation set forth above as if fully set forth herein.

96.     Human Interest and Colonial entered into a valid, enforceable, and binding contract.

97.     Pursuant to the contract, Colonial agreed that the information provided by Human Interest to Colonial was "only for the purposes of assisting [Human Interest] in verifying DOL compliance and providing clients with the opportunity to secure ERISA-related bonds and insurance from Colonial, and that none of [Human Interest's] client information would be shared with third parties."

98.     Colonial further agreed: "Neither of the parties to this Agreement shall disclose to any third person or entity any of the information that party received pursuant to this Agreement."

99.     Additionally, Colonial agreed that the client lists and any other information provided to Colonial pursuant to the BCPA was to be used only for the purpose of providing Human Interest and/or its clients with information related to bonds and insurance offered by Colonial, and Colonial could only directly service the plan and/or plan sponsors with Human Interest's consent.

100.    Essentially, Human Interest provided its confidential client information to Colonial so that Colonial could provide bonds to Human Interest's clients on behalf of Human Interest, not to solicit Human Interest's clients directly.

101.    Despite the terms of the BCPA, Colonial contacted Human Interest's clients directly to solicit bond renewals.

102.    Moreover, Colonial continued to directly contact Human Interest's clients to renew existing bonds, despite Human Interest's clear instructions to Colonial not to do so.

103.    Human Interest performed all actions required by the contract agreements and has fulfilled all of its obligations thereunder.

104.    Colonial breached the agreement by misusing Human Interest's confidential information in order to send unsolicited and improper emails to Human Interest's clients, which caused confusion, concern, and damage to Human Interest's business and reputation, and irreparable harm.

105.    Colonial's actions constitute a breach of the parties' contract.

106.    As a direct and proximate result of Colonial's breach of contract, Human Interest has suffered damages, including compensatory damages, consequential damages, and attorneys' fees, in an amount in excess of $75,000.00, the precise amount to be determined at trial, plus applicable interest and costs.

## COUNT V
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

107.    Human Interest repeats and realleges each and every allegation set forth above as if fully set forth herein.

108.    Human Interest and Colonial entered into valid, enforceable, and binding contract agreements.

109.    Human Interest performed all actions required by the contract agreements and has fulfilled all of its obligations thereunder.

110.    The parties' contractual agreements required Colonial to, at all times, exercise the utmost good faith and to deal fairly toward Human Interest in carrying out Colonial's obligations under the contracts by reason of the implied covenant of good faith and fair dealing under New Jersey law.

111.    Colonial breached the implied covenant of good faith and fair dealing with the purpose of depriving Human Interest of rights and benefits under the parties' contract agreements by, among other things, repeatedly failing to perform services as required under the contract, including deliberate and intentional non-performance despite ongoing contractual obligations; failing to provide premium refunds for various categories of bonds; failing to provide Advertising Transaction Revenue; failing to address and correct issues when raised; intentionally contravening explicit instructions from Human Interest; engaging in retaliatory conduct by soliciting business directly from Human Interest's clients; and misusing confidential information in order to send unsolicited and improper emails to Human Interest's clients.

112.    As a direct and proximate result of Colonial's conduct, Human Interest has suffered damages in an amount in excess of $75,000.00, including unpaid premium refunds, reimbursement of duplicate premium payments, cost to obtain bonds from an alternative provider, unpaid Advertising Transaction Revenue, compensatory damages, consequential damages, and attorneys' fees, the precise amount to be determined at trial, plus applicable interest and costs.

## COUNT VI
### (Unjust Enrichment – In the Alternative)

113.    Human Interest repeats and realleges each and every allegation set forth above as if fully set forth herein.

114.    Colonial benefitted directly and indirectly from the parties' contractual agreements and having access to Human Interest's confidential client information.

115.    Colonial received the benefit of Human Interest's confidential client information, which it used to directly and improperly contact Human Interest's clients.

116.    Retention of the benefit without payment would be unjust.

117.    By retaining the benefits of the parties' contractual agreements, including the unpaid reimbursement, unpaid ATR, and confidential client information to contact Human Interest's clients without permission, Colonial has been unjustly enriched.

118.    Human Interest entered into the contractual agreements in reliance and condition upon the representations, warranties, covenants, and promises made by Colonial, including to refund terminated bonds, to not issue duplicate bonds and charges, to provide Human Interest with ATR, to maintain completely confidential Human Interest's client information, and to not directly service Human Interest's clients without Human Interest's consent.

119.    It would be against equity and good conscience to permit Colonial to retain the benefits conferred by Human Interest without just and reasonable compensation to Human Interest.

120.    As a direct and proximate result of Colonial's unlawful conduct, it is also liable to Human Interest in an amount in excess of $75,000.00, including attorneys' fees, the precise amount to be determined at trial.

### COUNT VII
### (Tortious Interference With Economic Advantage)

121.    Human Interest repeats and realleges each and every allegation set forth above as if fully set forth herein.

122.    At all times material to the facts alleged in this Counterclaim, Human Interest had a reasonable expectation of economic advantage and a protectable interest in its actual and prospective relationships with its clients to act as fiduciaries and procure bonds.

123.    At all times material to the facts alleged in this Counterclaim, Colonial had actual knowledge and notice of Human Interest's reasonable expectation of these economic advantages.

124.    Colonial maliciously and unlawfully interfered with Human Interest's reasonable expectation of economic advantage as a fiduciary to its clients and frustrated the economic advantages of Human Interest in retaliation against Human Interest for, among other things, switching bond providers.

125.    Colonial knowingly and intentionally took these unlawful, unjustified, and malicious actions to interfere with, divert, and destabilize Human Interest's actual and prospective expectations of economic advantage and its contractual relationships with its clients.

126.    As a direct and proximate result of Colonial's intentional, unjustified, and unlawful interference with Human Interest's actual and prospective economic advantage, Human Interest has suffered damages in an amount in excess of $75,000.00, including attorneys' fees, the precise amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Human Interest respectfully requests that this Court:

A.    Award Human Interest actual, incidental, compensatory, and consequential damages in an amount to be determined at trial;

B.    Award Human Interest its attorneys' fees and costs of suit;

C.    Award Human Interest pre-judgment and post-judgment interest on such sums awarded;

D.      Permanently enjoin Colonial from using Human Interest's confidential business information;

E.      Permanently enjoin Colonial from contacting any customers of Human Interest; and

F.      Award Human Interest such other and further relief that is deemed just and proper.

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Human Interest demands a trial by jury on all issues so triable.

Dated: This 24 day of October 2025

Respectfully Submitted,

*s/ Kevin W. Weber*

_____

Kevin  W. Weber, Esq.
Jessica L. Guarracino, Esq.
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
Telephone: (973) 596-4500
Facsimile: (973) 596-0545
kweber@gibbonslaw.com
jguarracino@gibbonslaw.com

*Attorneys for Defendant/Counterclaim Plaintiff*
*Human Interest Inc.*

# EXHIBIT 1

DocuSign Envelope ID: 1F9807A5-E1A6-4B96-BBB4-BA7BE5C645CF

## Bond Compliance Program Agreement

## I.    OVERVIEW

1.    The purpose of this document is to outline the Bond Compliance Program. Ultimately, Colonial's goal is to make it easy for you and your clients to secure and maintain ERISA bonding that is approved by the U.S. Department of Labor ("DOL") and in compliance with ERISA. This agreement outlines our shared commitments to this relationship.

2.    Colonial and Captain401 Inc. have agreed to partner and assist each other in connection with providing ERISA Bonds and insurance for all of Captain401 Inc.'s retirement plan or retirement plan sponsor clients, and to maintain DOL compliance.

3.    Captain401 Inc. has agreed to assist and cooperate with Colonial to provide information regarding ERISA-related bonds and insurance to Captain401 Inc.'s clients who are or may be seeking to obtain the types of ERISA-related bonds and insurance issued by Colonial.

4.    Captain401 Inc. has agreed to provide Colonial with accurate information regarding plan profiles, which include the plan name, plan number and EIN number for all clients to whom Captain401 Inc. provides services.  In this way, Colonial and Captain401 Inc. can mutually assist each other to ensure that all Captain401 Inc.'s clients are in DOL ERISA Bond compliance.

5.    Colonial agrees that the plan information provided by Captain401 Inc. will not be disclosed to third parties.  This information will be incorporated into bond management reports for Captain401 Inc. and on Captain401 Inc.'s dashboard with Colonial. These reports will assist Captain401 Inc. in confirming and verifying DOL compliance, and simplifying the Form 5500 filing process.

## II.    CONFIDENTIALITY

1.    By providing for confidentiality in this program, Colonial agrees that the information provided by Captain401 Inc. to Colonial is only for the purposes of assisting Captain401 Inc. in verifying DOL compliance and providing clients with the opportunity to secure ERISA-related bonds and insurance from Colonial, and that none of Captain401 Inc.'s client information will be shared with third parties.

2.    Neither of the parties to this Agreement shall disclose to any third person or entity any of the information that party receives pursuant to this Agreement. However, to the extent required by law, either of the parties may disclose to (a) a client of Captain401 Inc. or (b) an insured of Colonial the fact that it provided information to, or received information

DocuSign Envelope ID: 1F9807A5-E1A6-4B96-BBB4-BA7BE5C645CF

from, the other party to this Agreement regarding the client or insured, and may further disclose to such person(s) information regarding the terms of this Agreement.

3.      Any and all client lists and any other information provided or given to Colonial pursuant to this Agreement will be used only for the purpose of providing Captain401 Inc. and/or its clients with information related to bonds and insurance offered by Colonial.

4.      Colonial agrees to hold in confidence any and all information regarding Captain401 Inc.'s clients that is provided to Colonial pursuant to the terms of this Agreement.

5.      In the event that this Agreement is terminated by either party, Colonial will, upon written request by Captain401 Inc., promptly return to Captain401 Inc. all original documents that were furnished by Captain401 Inc.

6.      Colonial shall indemnify Captain401 Inc. and hold Captain401 Inc. harmless from and against any claims, demands, liabilities, costs, fees or expenses associated with or arising out of any breach or alleged breach of the confidentiality agreement.

## III.    SERVICES PROVIDED BY COLONIAL SURETY

1.      Colonial will provide Captain401 Inc. with bond management system and computer software that generates reports to assist Captain401 Inc. with the information it needs to prepare its clients' forms 5500. The bond management reports will be uploaded to Captain401 Inc.'s dashboard.

2.      Colonial will provide Captain401 Inc. with web links and system updates that will be necessary to efficiently allow Captain401 Inc. to better service its retirement plan and plan sponsor clients.

3.      Colonial will provide Captain401 Inc. with bond management reports that will identify plan profiles to assist in determining ERISA compliance. The reports will include the names of all of Captain401 Inc.'s clients, whether or not they are bonded and insured by Colonial. The information will include the plan sponsor's name, address, telephone number, email address, trustee names, contact name, plan assets, bond and insurance and expiration dates. With your consent, Colonial will contact Captain401 Inc.'s clients to gather current expiration dates, to the extent necessary, and will update the bond management reports for Captain401 Inc. with this information.

4.      Colonial will assist Captain401 Inc. in the orderly transition of bond replacement coverage for each plan listed on the bond management reports. Colonial will provide the services of its account representatives to ensure a smooth transition and assist with the management of the renewal process.

5.      Colonial will directly service the plan and/or plan sponsors, as directed by Captain401 Inc..

DocuSign Envelope ID: 1F9807A5-E1A6-4B96-BBB4-BA7BE5C645CF

6.    Colonial will monitor and handle all future bond renewals to ensure continuous plan sponsor ERISA bond compliance.

7.    Colonial will provide Captain401 Inc. complete access to its bond maintenance systems and will agree to consider Captain401 Inc. requests for customized system adjustments.

8.    Colonial will issue all replacement bonds at a ten percent (10%) premium discount when the prior bond from another insurance Captain401 Inc. is replaced with a Colonial bond

9.    Colonial will provide access to management reports that identify Captain401 Inc.'s customers, bonds (including current limits of liability), renewal dates and billing summaries.

10.    Colonial will provide access to Captain401 Inc. to reprint any and all bonds issued to clients of Captain401 Inc. via an internet connection.

## IV.    SERVICES PROVIDED BY CAPTAIN401 INC.

1.    Captain401 Inc. will provide Colonial with basic plan and plan sponsor profile information for its plan and plan sponsor clients, which includes the plan name, plan number, plan sponsor EIN.

2.    Captain401 Inc. will inform all plan and plan sponsor clients about the benefits of the program and cooperate with Colonial in the bonding transition. Captain401 Inc. will be provided with email templates to forward to its client that describe the program.

3.    Captain401 Inc. will inform those plan and plan sponsor clients that do not currently have ERISA bonds, of the immediate ability to purchase Colonial ERISA bonds, that are DOL-approved ERISA bonds, and from a surety named on the Department of Treasury's listing of Approved Sureties, Department Circular 570.

4.    Captain401 Inc. will inform those plan and plan sponsor clients, that currently have ERISA bonds that require renewal, of the ability to replace their current bonds with Colonial's DOL-approved ERISA bonds, and Captain401 Inc. will provide Colonial with the bond renewal dates for these plans to transition their bonding.

5.    Captain401 Inc. will inform its plan and plan sponsor clients of the ability to obtain fiduciary liability insurance from Colonial to protect those clients from fiduciary liability exposure.

## V.    PAYMENT TO CAPTAIN401 INC.

Colonial agrees to compensate Captain401 Inc. as follows:

DocuSign Envelope ID: 1F9807A5-E1A6-4B96-BBB4-BA7BE5C645CF

1.      With respect to bonds issued by Colonial to or for retirement plans introduced to Colonial by Captain401 Inc., Colonial shall pay Advertising Transaction Revenue to Captain401 Inc. in an amount equal to ten percent (10%) of the first year premium paid (and received by Colonial) for the bond.

2.      With respect to policies of Insurance issued by Colonial to or for retirement plans or retirement plan sponsors introduced to Colonial by Captain401 Inc., Colonial shall pay Advertising Transaction Revenue to Captain401 Inc. in an amount equal to five percent (5%) of the first year premium paid (and received by Colonial) for the Policy of Insurance.

3.      Colonial shall pay to Captain401 Inc. the amounts set forth above in section 1 and 2, above, with respect to bonds issued by Colonial to or for retirement plans introduced to Colonial by Captain401 Inc., even if Captain401 Inc. does not provide administrative or recordkeeping services for the purchaser of the bond and/or insurance, provided Captain401 Inc.'s assigned referral code is used in connection with the purchase of said bond and/or Insurance.

4.      No payment shall be due, owing or payable from Colonial to Captain401 Inc. with respect to any renewal premium.

5.      Compensation to Captain401 Inc. is at the option of Captain401 Inc.. Captain401 Inc. may elect to receive no compensation.

## VI.    PLAN SPONSOR DISCOUNT

1.      When a plan sponsor not previously bonded by Colonial, purchases a Colonial ERISA bond,–the plan sponsor will earn a 10% discount on its ERISA bond purchase.

2.      The above discount will apply to future renewals by the plan sponsor of any Colonial bond.

## VII.   INDEMNITY

1.      Colonial indemnifies and holds harmless Captain401 Inc. and its affiliates, officers, directors, employees and agents against any and all loss, claim, damage, liability, penalty, fine or expense (including reasonable attorneys' fees) ("Losses") insofar as such Losses arise out of or are based upon any material breach of this Agreement or any applicable laws by Colonial or any of its representatives, except when the same is due to Captain401 Inc.'s or its affiliate's own misconduct or lack of good faith. This indemnification shall be in addition to any liability which Colonial may otherwise have.

## VIII.  TERMINATION

1.      This Agreement may be terminated by either party by giving written notice at least thirty (30) days in advance of the effective date of the termination which shall be set forth in the written notice. The provisions of sections **II., V. and VII.** of this Agreement shall survive the termination of this Agreement.

DocuSign Envelope ID: 1F9807A5-E1A6-4B96-BBB4-BA7BE5C645CF

      2.     The parties agree to review on an annual basis the respective services provided by Colonial and Captain401 Inc. under this Agreement.

      3.     Either party may also terminate the Agreement as set forth above to the extent the other party fails to provide the services required under this Agreement.

      4.     If either party terminates this Agreement, Captain401 Inc. will forfeit its ability to access the bond management reports and its dashboard.

      The parties agree to the above terms and conditions of this Bond Compliance Program Agreement.

**Captain401 Inc.**                                **Colonial Surety Company**

By: _Roger Lu_                                     By: _____
     3AB14EEDE0CC447...                     Wayne Nunziata, President

Dated: _11/24/15_                                  Dated: _11/24/15_

# EXHIBIT 2

Email

| | |
|---|---|
| **Msg. Date (CT)** | Thu Feb 18, 2021 12:53pm CT |
| From | mbonfante@colonialsurety.com |
| To | "Tim Ryan" <tim.ryan@humaninterest.com> |
| Cc | "Michael Schnitzer" <mike.schnitzer@humaninterest.com>, "Sophie Wang" <sophie.wang@humaninterest.com>, "Frank Xiao" <frank@humaninterest.com>, "Jeffrey Lui" <jefflui@humaninterest.com>, "Ryan Shevlin" <rshevlin@colonialsurety.com> |
| Subject | Re: ERISA Bond Refunds |

Hi Tim,

Yes. Client name and termination date should work.

Thank You,

Michael

Sent from my iPhone

> On Feb 18, 2021, at 1:40 PM, Tim Ryan <tim.ryan@humaninterest.com> wrote:

Hi Michael,

Great, we can start doing that moving forward. What kind of client details would you like included in the report?
Is Client Name & Termination/Deconversion Date satisfactory?

Thanks,

--
**Tim Ryan**
Senior Accounting Manager
650 308 4817
Join our team


On Thu, Feb 18, 2021 at 5:25 AM Michael Bonfante <mbonfante@colonialsurety.com> wrote:

We can prorate a refund for any of your Plan Sponsors who terminate their retirement plan mid policy period.   Per your request, you can send these at the end of each month.  Please note that this is only for our arrangement with Human Interest for the 3(16) side of the business.  Normal refund rules apply to the regular client base.

Thank You,

**Michael J. Bonfante**
Business Development Manager
mbonfante@colonialsurety.com
Direct: 201.949.1134
Office: 888.383.3313
Colonial Surety Company
123 Tice Blvd., Ste 250 ~ Woodcliff Lake, NJ ~ 07677
<image001.jpg>

**From:** Tim Ryan [mailto:tim.ryan@humaninterest.com]
**Sent:** Tuesday, February 16, 2021 12:10 PM
**To:** Michael Bonfante <mbonfante@colonialsurety.com>
**Cc:** Michael Schnitzer <mike.schnitzer@humaninterest.com>; Sophie Wang <sophie.wang@humaninterest.com>; Frank Xiao <frank@humaninterest.com>; Jeffrey Lui <jefflui@humaninterest.com>; Ryan Shevlin <rshevlin@colonialsurety.com>
**Subject:** Re: ERISA Bond Refunds

Hi Michael,

Appreciate you connecting with your accounting team to see what options are available to us.
As for expected terminations, we aren't expecting anything outside of the normal for us.
As our business expands we're expecting our churned clients to account for a meaningful amount of spend on ERISA bonds.

Thanks,

--
**Tim Ryan**
Senior Accounting Manager
650 308 4817
Join our team

On Tue, Feb 16, 2021 at 5:40 AM Michael Bonfante <mbonfante@colonialsurety.com> wrote:

I will have to address this with Accounting, as normally 1 year bonds are fully earned upon purchase.  Only our 3 year bonds offer a prorated refund. Are you foreseeing a lot of terminations to agreements?  There are certain things to consider, as the bond price we offer your 3(16) clients are 25% reduced.  I will get back to you on specifics once addressed.

Thank You,

**Michael J. Bonfante**
Business Development Manager
<u>mbonfante@colonialsurety.com</u>
Direct: 201.949.1134
Office: 888.383.3313
Colonial Surety Company
123 Tice Blvd., Ste 250 ~ Woodcliff Lake, NJ ~ 07677
<image002.jpg>

**From:** Tim Ryan [mailto:tim.ryan@humaninterest.com]
**Sent:** Monday, February 15, 2021 5:34 PM
**To:** Michael Bonfante <mbonfante@colonialsurety.com>
**Cc:** Michael Schnitzer <mike.schnitzer@humaninterest.com>; Sophie Wang <sophie.wang@humaninterest.com>; Frank Xiao <frank@humaninterest.com>; Jeffrey Lui <jefflui@humaninterest.com>
**Subject:** Re: ERISA Bond Refunds

Hi Michael,

Following up, I don't believe we ever heard back from your team on this request. Please let me know if there is another team member we should be discussing this with.

Thanks,
--
**Tim Ryan**
Senior Accounting Manager
650 308 4817
Join our team

On Fri, Dec 18, 2020 at 2:00 PM Tim Ryan <tim.ryan@humaninterest.com> wrote:

Hi Michael,

As we anticipate purchasing more & more ERISA bonds on behalf of our clients, we wanted to confirm our expectations around refunds for terminated clients.

If any of our clients terminate their plan in the middle of their 1 year ERISA bond, Colonial can issue us a refund for the remainder of the term, not utilized by the client.

What is the best way to communicate to clients that have terminated & how to properly request a refund from your team?
For Human Interest, we would be able to add this to our month end close process & provide a list on a monthly basis to your team. Let us know what criteria would be helpful to include & we'll see what we can provide.

Thanks,
--
**Tim Ryan**
Accounting Manager
650 308 4817
Join our team

Human Interest Inc. ("Human Interest") is a 401(k) provider that gives small and medium-sized businesses access to low-cost, high-quality retirement plans that make it easy to start saving for your future. Human Interest's investment advisory services are provided for a fee by Human Interest Advisors, LLC ("HIA"), a subsidiary of Human Interest.
See full disclosures.

# EXHIBIT 3

# Email

**Msg. Date (CT)** Wed Aug 21, 2024 2:37pm CT

**From** mbonfante@colonialsurety.com

**To** "Marcus Bowie" <marcus.bowie@humaninterest.com>

**Subject** Re: Human Interest Questions

Hi Marcus,

It's great to meet you virtually! I would be happy to jump on a Zoom call for any questions you may have. In regards to your questions regarding refund policies, we must be made aware of a client leaving or a plan termination before the halfway point in a client policy.  As long as we have this notice, we will prorate the premium back to your firm.  Dave Losito would usually reach out to myself or Abbey regarding some of these clients.  We receive these requests sporadically at this point and would love to streamline this process with you.  I was also in discussions with Amber and Michelle regarding a possible API build between our firms.  We would just need to have our IT Teams on a call to review. Please let me know when you might have time to jump on a call.  Looking forward to speaking with you!

Sincerely,

Michael J. Bonfante

Business Development Manager

Colonial Surety Company

**Email:** mbonfante@colonialsurety.com

**Direct:** 201-949-1134

**Office:** 888-383-3313

www.colonialsurety.com



*How did I do today? If I provided excellent service,*

*please take a moment to click here to let me know!*

On Wed, Aug 21, 2024 at 1:47 PM Marcus Bowie <marcus.bowie@humaninterest.com> wrote:

Hi Michael,

I'm stepping in and heading up the Customer Success and Operations team here at Human Interest, so I'll be the point person for our relationship going forward. I've been evaluating the terms of the relationship and have one question I'm hoping you can answer for me.

- We're doing some audits and may have some bonds associated with plans that have left Human Interest. At times that can happen pretty early on. Can you share any refund policy that exists for unused bond coverage?

I may have more questions as we go through this process, so if these should be directed elsewhere, please let me know.

Thank you,

**Marcus Bowie**

Interim Head, Customer Success and Operations

855 622 7824

**We're here to help.** Learn more about retirement planning at the Human Interest Learning Center. Visit our Support Center to browse self-help content or submit a request for assistance.

Human Interest is a full-service 401(k) and 403(b) provider that seeks to make it easy and affordable for small and medium-sized businesses to help their employees invest for retirement. Investment advising services are provided by Human Interest Advisors LLC, an SEC-Registered Investment Advisor. Registration does not imply a certain level of skill or training. Past performance is not an indication of future returns. There are risks involved with investing. This material has been provided for informational purposes only, and is not intended to provide investment, legal or tax advice. Additional information can be found in the company's Form ADV 2A. For full disclosures, visit https://humaninterest.com/disclosures/

*Report Generated 10/13/2025 1:33 PM CT by Kelly Moffitt*

# EXHIBIT 4

# Subject: Human Interest/Colonial - CEASE AND DESIST

 **McCormick, Sean** <Sean.McCormick@thompsonhine.com>       Fri, Jun 20, 2:43 PM
to Florina A. Moldovan, Adam R. Schwartz, Mincheff, Kelsey, MacLeod, Diane

Florina and Adam,

It has come to Human Interest's attention that Colonial is reaching out to Human Interest's customers directly and soliciting renewals for ERISA Bonds without Human Interest's knowledge or approval. In addition, it is our understanding that these communications to customers are purposefully misleading and do not alert the customers that Colonial is not acting in coordination with Human Interest, as required by the parties' Bond Compliance Program Agreement. Based on current information, Colonial has wrongfully contacted at least 81 of Human Interest's customers. This conduct is not permitted under the express terms of the parties' Agreement, contravenes the parties' course of dealing, violates Colonial's duty of good faith and fair dealing, constitutes unfair competition and will result in immediate irreparable harm to Human Interest.

Please confirm immediately that Colonial will cease and desist from such improper communications, which are directly interfering with Human Interest's customer relationships as well as damaging Human Interest's reputation in the marketplace. Absent such immediate confirmation, Human Interest will pursue appropriate legal action, including without limitation, seeking injunctive relief and indemnification for all of Human Interest's legal fees and costs associated with the prosecution of such claims, pursuant to the express terms of the Agreement. Human Interest's investigation into the scope of Colonial's bad faith conduct is ongoing. Human Interest reserves all rights.

Sean

**Sean P. McCormick** | Partner | **Thompson Hine LLP**
Austin Landing I | 10050 Innovation Drive, Suite 400 | Dayton, Ohio 45342-4934
**O:** 937.443.6824 | **M:** 937.478.4453
**F:** 937.443.6635 | www.ThompsonHine.com
Sean.McCormick@ThompsonHine.com



**A Smarter Way to Work – predictable, efficient and aligned with client goals. Read more.**

**Our commitment to innovation has been recognized by leading organizations such as the** *Financial Times, The American Lawyer*, *ABA Journal, Law360* **and Litera Microsystems. Learn more about our commitment here.**

Atlanta | Chicago | Cincinnati | Cleveland | Columbus | Dayton | Los Angeles | New York | Washington, D.C.
-


# EXHIBIT 5

# Human Interest

Kelly Moffitt <kelly.moffitt@humaninterest.com>

---

## Immediate Cessation Required
1 message

**Marcus Bowie <marcus.bowie@humaninterest.com>**          Fri, Jun 20, 2025 at 5:32 PM
To: mbatty@colonialsurety.com, Michael Bonfante <mbonfante@colonialsurety.com>, sscott@colonialsurety.com,
bbuccino@colonialsurety.com, "tchen@colonialsurety.com" <tchen@colonialsurety.com>, "wnunziata@colonialsurety.com"
<wnunziata@colonialsurety.com>
Bcc: kelly.moffitt@humaninterest.com

Hi all,

We have discovered that Colonial is contacting Human Interest clients about surety bond renewals. This is
unacceptable and directly contradicts our explicit prior instructions. You must immediately cease all direct contact with
Human Interest clients regarding surety bond renewals.

As you are well aware, Human Interest has transitioned to a new bond provider and gave Colonial explicit instructions
**_not_** to renew any existing bonds. Yet, despite this clear directive, we have confirmed reports that Colonial has been
directly contacting our clients to solicit bond renewals.

To underscore the gravity of this situation, please be aware that our attorneys have sent a cease and desist letter to
your legal counsel.

To be absolutely clear:

- Human Interest acts as a fiduciary for our 401(k) clients, and we are responsible for all bond procurement
  decisions on their behalf.
- We have already secured the necessary coverage through our new provider.
- Colonial is NOT authorized to contact our clients directly regarding these matters.
- Any such contact from Colonial creates confusion and directly interferes with our fiduciary responsibilities.

**Colonial must immediately stop all outreach to Human Interest clients regarding bond renewals, effective
immediately.**

We require written confirmation by close of business Monday, June 23, that all such contact has ceased and that no
further unauthorized client solicitation will occur.

We expect your full cooperation in rectifying this situation to ensure a smooth transition for our mutual clients.

Please confirm your receipt of and compliance with this request.

Thanks,

**Marcus Bowie**
Head of Customer Success and Operations
855 622 7824

**We're here to help.** Learn more about retirement planning at the Human Interest Learning Center. Visit our Support Center to
browse self-help content or submit a request for assistance.

Human Interest is a full-service 401(k) and 403(b) provider that seeks to make it easy and affordable for small and medium-sized businesses to help their employees

invest for retirement. Investment advising services are provided by Human Interest Advisors LLC, an SEC-Registered Investment Advisor. Registration does not imply a certain level of skill or training. Past performance is not an indication of future returns. There are risks involved with investing. This material has been provided for informational purposes only, and is not intended to provide investment, legal or tax advice. Additional information can be found in the company's Form ADV 2A. For full disclosures, visit https://humaninterest.com/disclosures/

# EXHIBIT 6

---------- Forwarded message ---------
From: **Bradyn Rybacki** <<u>brybacki@colonialsurety.com</u>>
Date: Mon, Aug 18, 2025 at 9:17 AM
Subject: EXPIRED ERISA Fidelity Bond Renewal ███████████
To: ███████████████████

Hi ██████

As per my voicemail, I am the account manager here at Colonial Surety Company who will be handling the ERISA Fidelity Bond for ████ ███████████████████████ The bond that we hold expired ██████████ I attached it below for your reference.

The ERISA Fidelity Bond is required by the Department of Labor to protect retirement plan participants from any misuse or mishandling of plan funds. If you do not renew this policy, you will remain **OUT OF COMPLIANCE** with the Department of Labor, and may even trigger an audit and other investigative actions. **If you no longer need this policy, please let me know** so that I can properly close your account with us. If you would like to take advantage of an ongoing promotion to renew your bond at a discounted rate while gaining supplemental coverage for your personal assets, please click on the see offer button once logged in for additional details.

For convenience, to complete your bond renewal and select your coverage package, just follow this link and log in: <u>https://quote.colonialsurety.com/.</u>

**Username:** ████████████████████

Do not hesitate to contact me if you have any questions or concerns.

Thank you,

**Bradyn Rybacki**